FESSEL, ADMR., APPELLEE, *v.* SCHWARTZ, A MINOR, APPELLANT.

(No. 7629—Decided November 24, 1952.)

*Mr. Wm. H. Deddens* and *Messrs. Rendigs, Fry & Kiely;* for appellee.

*Messrs. Pogue, Helmholz, Culbertson & French,* for appellant.

MATTHEWS, J.  This is an appeal on questions of law in an action for wrongfully causing the death of Shirley Fessel, who was 15 years of age at the time of her death.

There was a trial to a jury during which, at the close of the plaintiff's evidence and at the close of all the evidence, the defendant moved for an instructed verdict and for judgment, both of which motions were overruled.  The issues of fact were submitted to the jury, resulting in a verdict for the defendant.

The plaintiff moved for a new trial, which was granted.

The notice of appeal designates the orders overruling the motions for an instructed verdict and, also, the motion granting a new trial, as the orders appealed from.

To give to the order granting a new trial the quality of finality essential as a predicate for an appeal, the conclusion must be reached by the reviewing court that the trial court abused its discretion.  In this case the court specified four grounds for granting the new trial, one of which was misconduct of counsel in final argument to the jury.  The bill of exceptions does not set forth that argument.  On that state of the record it is impossible for this court to pass upon the claim of abuse of discretion.  As the jurisdiction of the court is dependent upon a finding of an abuse of discretion in granting the motion for a new trial, we abstain from any ruling upon the attempted appeal from the order granting a new trial because of lack of jurisdiction.

The jurisdiction of the court is properly invoked to review the orders overruling the defendant's motions for an instructed verdict and for judgment.  We shall address ourselves to that branch of the appeal only.

The sole defendant in this action at the time of its inception was James Schwartz, a minor 17 years of age. After the trial, his father, James Schwartz, was made a party defendant, and an amended petition was filed incorporating allegations that would impose liability upon him under Section 6296-10, General Code, as the signer of James Schwartz' application for an operator's license.

The events leading up to the tragedy, as portrayed by the evidence, started at a meeting of young people on the night of June 4, 1950, at the home of Joan Madlener, on Hegry Circle, a street that runs westwardly from Ferguson road, both being public streets in the city of Cincinnati. The meeting was at night and was attended by from 10 to 15 boys and girls, all about the same age as James Schwartz. James Schwartz had come to the meeting in his father's automobile. Another boy by the name of Blume came to the meeting in another automobile. The meeting was of a social nature and there was no misconduct or disorder of any description by any one. About 11 p. m. the young people concluded to go to Delhi, a neighboring village, for lunch and soft drinks. They used the two automobiles to make the journey.

For some reason eight passengers, including Shirley Fessel, entered the Schwartz automobile, and five or six entered the Blume automobile. Schwartz and Blume operated their respective automobiles and proceeded to Delhi without any misadventure. They obtained their lunch and soft drinks and at about 11:30 p. m. left the restaurant. Those who had come in the Schwartz automobile entered it and those who had come in the Blume automobile entered it, the intent being to take the girls to their respective homes. The automobiles left the parking place at the restaurant at the same time, the Blume automobile being in the lead. It is not clear how far Delhi is from the Madlener

home, but on the way back to the neighborhood where the girls lived, they proceeded along Greenwall street, Pedretti street, Eighth street, Overlook avenue and Ferguson road to Queen City avenue, where the accident occurred out of which this action arose. They are all public streets, and in traversing them the automobiles crossed intersecting streets, controlled by stop signs or traffic lights. Schwartz stopped his automobile at Greenwall and Pedretti streets. There was no stop sign at Pedretti and Eighth streets. He stopped at Overlook avenue and Eighth street and at Overlook and Glenway avenues before they reached Ferguson road and Glenway avenue, where there was a traffic light at which traffic was permitted to turn to the right without stopping, and that was the way the Schwartz automobile proceeded. Whether it stopped before turning does not appear. The evidence shows that the automobiles had proceeded to this point fairly close together, and that perhaps they changed position once or twice before reaching Ferguson road, the Blume automobile being in the lead when they entered Ferguson road. Ferguson road is a straight four-lane highway, and while the two automobiles were proceeding along it, the Schwartz automobile passed the Blume car and in doing so reached a speed variously described by the occupants of the automobile as "too fast," "so fast that we became afraid," "40 or 45 miles," "between 45 and 50," miles per hour. Several asked Schwartz to "slow down or let them out." Whether he slowed down is in dispute, but at least one witness said he did not. It is uncontradicted that when they reached the intersection of Ferguson road and Queen City avenue, Schwartz brought his automobile to a complete stop before proceeding into Queen City avenue. They turned left or westwardly on Queen City avenue and proceeded some distance, undeter-

mined by the evidence, to the intersection with Boudinot avenue, where there was a stop sign. The Blume automobile was just ahead of the Schwartz automobile in reaching Boudinot avenue. Blume reduced the speed of his automobile, shifted into second or low gear, and proceeded across the intersection without coming to a complete stop. Schwartz, following Blume, did the same.

They proceeded westwardly for some distance from Boudinot avenue on Queen City in the same relative position, both being on the right side of Queen City avenue. Queen City avenue is a four-lane street at that point and five or six hundred feet west of Boudinot avenue curves to the north. The record contains no data from which to determine the extent of this curve. While Schwartz knew of the curve, there is no evidence that he knew the extent of the curve. Just before reaching this curve, Schwartz traveled from the right lane behind Blume's automobile to the left and astride the middle line of the street and was entering the curve when the automobile skidded, on sand or gravel, toward the south side of the street. Schwartz lost control of the car and it continued toward the sloping curb, traveled along it for several feet, then along the space between the curb and sidewalk, struck a small tree standing in that space and proceeded about 15 feet, where the left side of the automobile struck and broke a wooden pole. The automobile continued on for about 50 feet, turned over, and finally was on its side when it stopped. After it hit the pole, the automobile turned over once or twice. It was badly damaged.

The rate of speed as they entered the curve was estimated as low as 30 miles per hour and as high as 50 miles per hour. Some occupants of the Blume automobile saw the accident as it was happening. Blume immediately applied his brakes and made a U-turn

without stopping and immediately returned to the scene.

There was no other traffic on Queen City avenue in that section at the time.

There is no evidence of the visible distance ahead on Queen City avenue at that point. There is no basis for any claim that the assured-clear-distance statute was violated. There is no evidence that Schwartz knew the extent of the curve or bend.

While a part of Schwartz' automobile was on the left side of the street when he lost control, we know of no statute that was violated thereby. Indeed, Section 6307-25, General Code, specifically excepts vehicles passing other vehicles going in the same direction from the requirement that automobiles should be driven on the right side of the street.

Much evidence was introduced as to the operation of these automobiles from the time they started from the restaurant to the time of the accident. This evidence shows that Schwartz observed all traffic signs at intersections. He stopped several times in obedience to signals. He did travel at a high speed on Ferguson road, but came to a complete stop thereafter at Ferguson road and Queen City avenue. That fact, it seems to us, breaks any possible chain of causation between Schwartz' conduct prior to that time and the accident that occurred thereafter on Queen City avenue.

We are also of the opinion that the fact Schwartz slowed down and shifted gears instead of coming to a complete stop at Boudinot avenue cannot be regarded as a cause of this accident. Had a collision occurred in that intersection, his failure to come to a complete stop would or might have been a cause thereof. However, it could have no possible relation to an accident occurring 600 feet beyond, resulting from an automo-

bile leaving the traveled portion of the street and colliding with objects between the curb and sidewalk.

This accident was caused by the curve, the condition of the surface of the street, and the speed of the automobile. The latter factor—the speed—was contributed by Schwartz, and without doubt a trier of the facts would be justified in finding that his negligence in proceeding at that speed was the cause without which he would not have lost control of his automobile. That, however, is not sufficient to impose liability upon him in favor of a guest in his automobile.

Section 6308-6, General Code, limits liability of the person responsible for the operation of an automobile to a guest, resulting from its operation, to injuries or death caused by his ''wilful or wanton misconduct.''

We fail to find that the decedent's death was ''*caused*'' by any wilful or wanton misconduct on the part of the defendant James Schwartz.

Section 6308-6, General Code, has been applied many times and to diverse circumstances. The abstract rule announced by the Supreme Court in *Universal Concrete Pipe Co.* v. *Bassett,* 130 Ohio St., 567, 200 N. E., 843, 119 A. L. R., 646, has been reaffirmed and applied many times. The second paragraph of the syllabus to that case is as follows:

''Wanton misconduct is such conduct as manifests a disposition to perversity, and it must be under such surrounding circumstances and existing conditions that the party doing the act or failing to act must be conscious, from his knowledge of such surrounding circumstances and existing conditions, that his conduct will in all common probability result in injury. * * *''

In the first paragraph of the syllabus, the court points out that mere negligence cannot be converted into wanton misconduct by the use of the word, ''wan-

ton,'' in connection with the specifications of negligence.

Appellee's counsel rely on several cases, but we think they are clearly distinguishable.

In *Jenkins* v. *Sharp,* 140 Ohio St., 80, 42 N. E. (2d), 755, the defendant on the evidence could have been found to have deliberately disregarded several traffic warnings to stop, to have crossed a much traveled thoroughfare, notwithstanding his view to the right was obstructed, and to have collided in the intersection with an automobile coming from his right.

If this accident had occurred in the intersection of Queen City avenue and Boudinot avenue, *Jenkins* v. *Sharp, supra,* would have some application. It can hardly be said to apply to the facts of this case.

Another case relied on is that of *Kennard* v. *Palmer,* 143 Ohio St., 1, 53 N. E. (2d), 908. We quote the first paragraph of the syllabus to show the perversity of the defendant's conduct and that it continued up to and caused the collision:

''Under a petition charging the defendant with 'wanton and wilful misconduct' in the operation of his automobile, the question whether he was guilty of such misconduct was properly left to the jury where the evidence offered by plaintiff tended to prove that, at and some time before a collision, the defendant was driving his automobile equipped with defective tires at a speed of between 60 and 70 miles per hour over a road having a number of curves and being rough in places; that before the collision he had driven back and forth across the road, to the discomfort of his passengers and against their protests; that he passed one or more vehicles in a reckless manner; and that in descending a hill he increased his speed, struck another vehicle and collided with a post at the edge of the roadway, causing personal injuries to the plaintiff, a guest-passenger.''

Next, *Tighe, a Minor,* v. *Diamond,* 149 Ohio St., 520, 80 N. E. (2d), 122, is cited as supporting appellee's position. In that case the operator of the automobile was a minor, as in this case, and his father, who had signed his application for a driver's license, as in this case, was joined as a defendant. Notwithstanding the difference in wording of the statute (Section 6296-10, General Code) imposing liability on the father and the language of the guest statute imposing liability upon the minor operator, the case was tried and the Supreme Court treated it as a case governed by the guest statute as to both defendants. The minor defendant invited two girls to take a ride with him in his father's automobile. There was a road that had been crossed by an interurban electric railroad line. When the railroad was abandoned it left a hump four or five feet above the general level of the highway where the railroad had crossed. The minor defendant, having crossed over this hump a few days before and admittedly knowing of its existence, and for the purpose of giving the girls a thrill, deliberately drove his automobile over this hump at a speed of 60 miles per hour, thereby throwing the automobile upward and hurling the girls against the top, rendering them unconscious and wrecking the automobile. We think a statement of the facts sufficiently shows the inapplicability of that case.

Appellee's counsel also cite *Ulrich* v. *Massie,* 89 Ohio App., 362, 102 N. E. (2d), 274, as "in the same vein" as *Jenkins* v. *Sharp, supra.* It is true that the same general principles are announced in those cases, but the similarity ends there. The facts in *Ulrich* v. *Massie* are set forth in great detail showing excessive speed and failure to keep a lookout, but not showing perversity, the court saying at page 369, "the perversity of conduct of the operator of the car ceased prior to the collision and was not a proximate cause thereof."

As a result of its conclusion that the evidence failed to show any wilful or wanton misconduct, the court reversed the judgment for the plaintiff and entered final judgment for the defendant. A reading of that case will disclose its inapplicability to the case at bar and certainly that it furnishes no support for the plaintiff.

Likewise, the facts in *Helleren, Admx., v. Dixon,* 152 Ohio St., 40, 86 N. E. (2d), 777, are so dissimilar as to destroy the case as a guide to a correct conclusion in the case at bar. However, it should be said that in the presence of aggravated negligence and deliberate taking ''a chance'' that nothing would happen, the Supreme Court reversed the judgment for the plaintiff and entered final judgment for the defendant.

We are of the opinion that the trial court erred in overruling the defendant's motions for an instructed verdict and for judgment.

For these reasons, the orders of the court in that respect are reversed, and final judgment is entered for defendants.

*Judgment reversed.*

HILDEBRANT, P. J., concurs.